**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**FRED BURGESS, II,**

                                    **Plaintiff,**

        **vs.**                                                **5:14-CV-1371**
                                                               **(MAD/ATB)**

**CHRISTOPHER DEJOSEPH,** *individually and in*
*his official capacity*, **ROBERT TEATER,** *individually*
*and in his official capacity*, **FRED LAMBERTON,**
*individually and in his official capacity*, **Syracuse**
**Police Chief FRANK L. FOWLER,** *individually and*
*in his official capacity*, **and the CITY OF SYRACUSE,**

                                    **Defendants.**
_____

**APPEARANCES:**                           **OF COUNSEL:**

**LAW OFFICE OF ZACHARY C. OREN**          **ZACHARY C. OREN, ESQ.**
401 Rutger Street
Utica, New York 13501
Attorneys for Plaintiff

**CITY OF SYRACUSE CORPORATION**           **TODD M. LONG, ESQ.**
**COUNSEL**
233 East Washington Street
Room 300 City Hall
Syracuse, New York 13202
Attorneys for Defendants

**Mae A. D'Agostino, U.S. District Judge:**

**MEMORANDUM-DECISION AND ORDER**

**I. INTRODUCTION**

    Plaintiff commenced this action pursuant to 42 U.S.C. § 1983 alleging that several

individuals and the City of Syracuse violated his constitutional rights in connection with his

January 1, 2013 arrest and subsequent prosecution. *See* Dkt. No. 1. Defendants filed an answer

to the complaint on January 23, 2015. *See* Dkt. No. 9.

Currently before the Court are Defendants' motion for summary judgment and Plaintiff's cross-motion for leave to file an amended complaint. *See* Dkt. No. 28-36; Dkt. No. 38 at 19 n.18. On October 5, 2016, Plaintiff filed a memorandum of law in opposition to Defendants' motion and cross-moved for leave to file an amended complaint. *See* Dkt. No. 38. On November 21, 2016, Defendants filed a reply memorandum of law in further support of their motion. *See* Dkt. No. 51-4.

## II. BACKGROUND

On December 31, 2012, at 11:23 p.m., multiple officers of the Syracuse Police Department ("SPD") responded to the fatal shooting of David A. Jones, II at 744 West Onondaga Street in Syracuse, New York. *See* Dkt. No. 28-35 at ¶¶ 1-2. When SPD officers arrived at the scene, they observed many dozens of people standing around the area. *See id.* at ¶ 3. SPD officers at the scene interviewed several potential witnesses who gave descriptions of the suspect. *See*, *e.g.*, Dkt. No. 1 at ¶¶ 24, 38. One such officer, Officer John Nye, identified a male at the scene named Jaquan Pridgen. *See* Dkt. No. 28-35 at ¶ 5. Pridgen informed Officer Nye that he was an eyewitness to the murder, s*ee id.* at ¶ 6, and that the perpetrator was "a black male approximately 6'2" weighing 200lbs with facial hair" who "was wearing an orange champion hooded sweatshirt." Dkt. No. 28-2 at 2; *see also* Dkt. No. 28-35 at ¶ 34. Similarly, Pridgen informed Officer Joseph Taylor that he observed a "20's black male approx. 6'02" tall, 200 lbs, wearing a [sic] orange 'Champion' hooded sweatshirt." Dkt. No. 41-1 at 7. SPD Detective Tara Galanaugh arrived at the scene at 11:45 p.m. and located Pridgen as well as another eyewitness: Pridgen's sister, Reonnia Grady. *See* Dkt. No. 28-35 at ¶ 7. Pridgen and Grady were then transported to SPD's Criminal Investigations Division where Detective Brian Williams interviewed Pridgen and Detective Matthew Arduini interviewed Grady. *See id.* at ¶ 8.

At the station, Pridgen described the perpetrator to Detective Williams as "approximately 25-30 years old, 5'07" – 6'00" tall, wearing a dark orange/mustard orange sweatshirt with a large 'C' on the front, and possibly wearing a half facemask or having some type of facial hair." *Id.* at ¶ 33. According to a narrative supplement prepared by Detective Williams, Pridgen "said that he does not believe that he would be able to identify the black male suspect if he saw pictures" but "was willing to try." Dkt. No. 28-2 at 7-8. During her interview with Detective Arduini, Grady described the suspect as "a dark skinned black male wearing a mask over the lower portion of his face" and a "'goldish/yellow' hooded sweatshirt with a big 'C' on the front side of the shirt" who was approximately 5'07" and "chunky" but not "fat." Dkt. No. 28-35 at ¶ 41. According to a narrative supplement prepared by Detective Arduini, Grady "was unsure if she would be able to identify the suspect, but added that she was will trying to try and would further cooperate with the investigation." Dkt. No. 28-2 at 19. After their interviews, Pridgen and Grady were transported home by the police. *See* Dkt. No. 1 at ¶ 34.

At approximately 9 a.m. on January 1, 2013, Pridgen and Grady were transported by SPD officers back to the station. *See id.* at ¶ 35. There, Detective Christopher DeJoseph interviewed and secured a statement from Pridgen, and Detective Fred Lamberton interviewed and secured a statement from Grady. *See* Dkt. No. 28-35 at ¶ 42. In his sworn statement, Pridgen claimed that he "clearly saw [the suspect's] face" and described the suspect as "dark skinned with a goatee or beard." Dkt. No. 28-7 at 1. Pridgen also noted that "[a]fter the whole thing happened some people were saying the guy had a mask on, but I don't remember that." *Id.* Defendant DeJoseph then showed Pridgen a photo array of six photographs. *See* Dkt. No. 28-35 at ¶ 47. Pridgen positively identified Plaintiff as the individual who shot Jones. *See id.* at ¶ 48. In his sworn statement, Pridgen stated that he "recognized" Plaintiff "right away" as the suspect after seeing

the photos. Dkt. No. 28-7 at 2. In her sworn statement, Grady attested that she "did see [the suspect's] face" and described the shooter as "a black male, in his early thirties, 5'08" tall with a medium build . . . wearing a [sic] orange in color hooded zip up sweatshirt" which "had a large 'C' across the chest area." Dkt. No. 28-35 at ¶ 53. According to Defendant Lamberton's narrative supplement, Grady "was certain that if given the opportunity she would be able to identify the suspect." Dkt. No. 28-4 at 4. Defendant Lamberton then showed Grady a photo array of six photographs. *See* Dkt. No. 28-35 at ¶ 55. According to her sworn statement, Grady "immediately identified" Plaintiff as the person who shot Jones after seeing the photos. Dkt. No. 28-6 at 2.

At 1:14 p.m. that same day, Officer Robert Teater and Sergeant John Savage brought Plaintiff in for questioning, *see* Dkt. No. 28-35 at ¶¶ 60, 68, where he was interviewed by Defendants DeJoseph and Lamberton as well as Detectives Rory Gilhooley and Daniel Walsh, *see id.* at ¶ 71. Plaintiff was then arrested and charged with Murder in the First Degree, Attempted Robbery in the First Degree, and Criminal Possession of a Weapon in the Second Degree. *See id.* at ¶¶ 81-82. The arrest report identifies Defendant DeJoseph as the arresting officer and Defendant Lamberton as the assisting officer. *See* Dkt. No. 28-3 at 1. Also according to the arrest report, Plaintiff was 5'7", weighed 180 pounds, and was 34 years old as of January 1, 2013. *See id.* Detective VanSlyke signed the felony complaint related to the murder and weapon possession charges, and Detective Von Knoblauch signed the felony complaint related to the robbery charge. *See* Dkt. No. 28-35 at ¶ 84. The felony complaints were received on January 2, 2013, *see id.*, and Plaintiff was arraigned in Syracuse City Court on that same day, at which time he plead not guilty to all charges, *see* Dkt. No. 28-22 at 16.

On January 4, 2013, grand jury proceedings were held at the direction of Chief ADA Matthew J. Doran. *See* Dkt. No. 28-35 at ¶ 93. The grand jury indicted Plaintiff on all counts.

*See id.* at ¶¶ 99-100.  On April 25, 2013, the Honorable Thomas J. Miller presided over a *Wade/Huntley* hearing concerning Plaintiff's challenge to the admissibility of the eyewitness identifications of Pridgen and Grady.  *See id.* at ¶ 108.  Judge Miller found "that the People have met their burden of showing the reasonableness of the police conduct and absence of suggestiveness of the identification procedures."  Dkt. No. 28-22 at 12-13.  By decision dated July 15, 2013, Judge Miller denied a request by Plaintiff to dismiss or reduce the indictment, finding that "the evidence presented to the Grand Jury was legally sufficient to support the offenses contained in the indictment, the proceedings were not defective and proper legal instructions were given to the Grand Jury."  *Id.* at 6.  On October 31, 2013, Plaintiff was acquitted by a jury on all counts related to the murder of Mr. Jones.  *See* Dkt. No. 28-35 at ¶ 116.

### III. DISCUSSION

**A.  Standard of review**

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law.  *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994).  When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'"  *Id.* at 36-37 (quotation omitted).  Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleading.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c), (e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255 (1986)) (additional citations omitted).  Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather, the court must be satisfied that the citations to evidence in the record support the movant's assertions.  *See Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

## B.     False arrest

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, . . . is substantially the same as a claim for false arrest under New York law."  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (citations omitted).  Under New York law, the elements for a claim for false arrest are as follows: "'(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.'"  *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)); *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994).

A warrantless arrest is "presumptively unlawful."  *See Raysor v. Port Auth. of New York and New Jersey*, 768 F.2d 34, 40 (2d Cir. 1985) (stating that "the plaintiff need not prove either malice or want of probable cause"); *see also Jenkins v. City of New York*, 478 F.3d 76, 88 (2d Cir. 2007).  However, "[t]here can be no federal civil rights claim for false arrest where the arresting officer had probable cause."  *Singer*, 63 F.3d at 118 (citing *Bernard*, 25 F.3d at 102).  Accordingly, the presumption that a warrantless arrest is unlawful can be rebutted by the

defendant if it is established that there was probable cause for the arrest. *See Jenkins*, 478 F.3d at 88. The existence of probable cause is a complete defense, for which the defendant bears the burden of proof. *See Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d Cir. 2010); *Weyant*, 101 F.3d at 852 (citing *Bernard*, 25 F.3d at 102).

There is "probable cause to arrest . . . when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant*, 101 F.3d at 852 (citations omitted). The standard is "a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *United States v. Delossantos*, 536 F.3d 155, 159 (2d Cir. 2008) (internal quotation marks omitted) (quoting *Maryland v. Pringle*, 540 U.S. 366, 370 (2003)).

"[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). The significance of those facts can be enhanced or diminished by the surrounding circumstances of the arrest, *see Jenkins*, 478 F.3d at 90, because the standard is fluid and contextual, *see Delossantos*, 536 F.3d at 159. The circumstances "must be considered from the perspective of a reasonable police officer in light of his training and experience." *Id.* Whether there was probable cause is a question that can be determined as a matter of law on summary judgment "if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852; *see also Jenkins*, 478 F.3d at 88. Summary judgment should be granted in favor of the defendants where

the facts, construed in favor of the plaintiff, establish that the officer's probable cause determination was objectively reasonable. *See Jenkins*, 478 F.3d at 88.

"Absent circumstances that cast doubt on the reliability of an identification, such as an unduly suggestive procedure, 'positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest.'" *Williams v. City of New York*, No. 14–CV–7158, 2016 WL 3194369, *4 (S.D.N.Y. June 7, 2016) (collecting cases) (quoting *Celestin v. City of New York*, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008)). "'Under New York law an identified citizen informant is presumed to be reliable.'" *Stansbury v. Wertman*, 721 F.3d 84, 91 n.5 (2d Cir. 2013) (quoting *Caldarola v. Calabrese*, 298 F.3d 156, 165 (2d Cir. 2002)). "The same rule applies to identifications of the perpetrator from photographic arrays." *Id.*

Drawing all reasonable inferences in Plaintiff's favor, the Court finds that there was probable cause to arrest Plaintiff. Pridgen and Grady independently selected Plaintiff from a photo array as the individual who shot Jones. *See* Dkt. No. 28-35 at ¶¶ 48, 56. Although Plaintiff does not contend that the photo array was suggestive, Plaintiff argues that the following circumstances cast doubt on Pridgen's and Grady's reliability: the two eyewitnesses (1) "upon being re-interviewed gave materially inconsistent statements," (2) were "contaminated" at the time they identified Plaintiff in the photo array because they were allowed to return home together after Detective Williams interviewed Pridgen and Detective Arduini interviewed Grady in the early morning of January 1, 2013, and (3) gave testimony "materially inconsistent . . . with other eyewitness testimony." Dkt. No. 38 at 7, 10.

Plaintiff argues that Defendants should have questioned Grady's veracity because she told Detective Arduini that Plaintiff was "wearing a mask over the lower portion of his face" and that she "was unsure if she would be able to identify the suspect, but added that she was willing to

8

try," Dkt. No. 28-2 at 19, yet later indicated to Defendant Lamberton that she was "certain that if given the opportunity she would be able to identify the suspect," Dkt. No. 28-4 at 4. However, there is no question of material fact that prior to Plaintiff's arrest on January 1, 2013, Defendants were not aware of the statements concerning Grady contained in Detective Arduini's report.[1] At his deposition, Defendant DeJoseph testified that he "hadn't reviewed anyone else's supplemental narratives by the end of the week," *i.e.*, by January 4, 2013, and that nobody had asked him to reconcile the reports. Dkt. No. 28-30 at 46-47. Detective Lamberton testified at his deposition that he "[n]ever did" read anyone else's narrative supplement except for one of Detective DeJoseph's and that he had not talked to the officers who had previously interviewed Pridgen and Grady. Dkt. No. 28-31 at 21; *see also id.* at 13. Similarly, at the *Wade/Huntley* hearing held on April 25, 2013, Defendant Lamberton testified that he was not aware that Grady had told Detective Arduini that she was unsure whether she could identify the suspect. *See* Dkt. No. 28-20 at 48. Therefore, the alleged inconsistencies are irrelevant because only information known to the arresting officers at the time of the arrest can affect the probable cause determination. *See O'Brien v. City of Yonkers*, No. 07–CV–3974, 2008 WL 9355521, *8 (S.D.N.Y. Dec. 9, 2008), *report and recommendation adopted*, 2013 WL 1234966 (S.D.N.Y. Mar. 22, 2013) ("Although conflicting accounts of the robbery and the suspect are memorialized in several police memoranda, there is no evidence in the record that suggests that these inconsistencies were

---

[1] Plaintiff contends that Defendants Lamberton and DeJoseph must have been "well aware of the height inconsistency reported by [ ] Pridgen, originally reporting the shooter height to be 6 foot 2 inches" because Lamberton indicated to Plaintiff during Plaintiff's interrogation that some witnesses had described the suspect as six feet tall. Dkt. No. 38 at 11; *see also* Dkt. No. 28-16 at 213-14. Even assuming this is sufficient to raise a factual dispute as to whether Defendants Lamberton and DeJoseph were aware prior to the arrest that Pridgen had claimed the suspect was 6'02", it does not raise a question of fact as to whether Defendants Lamberton and DeJoseph reviewed Detective Arduini's report prior to arresting Plaintiff.

presented to Defendants McCabe and Skully at the time they arrested Plaintiff or were known to Defendants McCabe and Skully when they interviewed [the witness]. . . . Plaintiff's argument that the mere existence of these conflicts in the abstract required Defendants McCabe and Skully to conduct a further investigation is contrary to well-established Second Circuit case law"). Moreover, even assuming Defendants Lamberton and DeJoseph were aware prior to the arrest that Pridgen had described the suspect as 6'02", it was not unreasonable under the circumstances for Defendants to take Pridgen's independent selection of Plaintiff's photograph into account. *See Newton v. City of New York*, 640 F. Supp. 2d 426, 446 (S.D.N.Y. 2009) ("The fact that V.J. had been drinking on the night of the incident does damage the reliability of her identification of Newton and the reasonableness of defendants' having relied on her selection of Newton's photo from the photo array. Had defendants relied on V.J.'s selection alone, there would be a more legitimate question as to the existence of probable cause. But defendants showed another photo array to Mrs. Gonzalez and got a consistent result. Based on the totality of facts known to defendants, there is no genuine dispute of material fact that defendants had probable cause to arrest Newton prior to the lineup").

The Court also rejects Plaintiff's claim that Grady and Pridgen colluded to identify Plaintiff. Where, as here, there are no credible allegations that the witnesses personally knew the suspect, had ever seen the suspect prior to identifying him, or had a hidden motive, courts will not presume that the witnesses' independent photo identifications were contaminated merely because they had the opportunity to communicate. *See Vasquez v. City of New York*, No. 14–CV–491, 2014 WL 5810111, *10 (S.D.N.Y. Nov. 6, 2014) (rejecting the argument that a witness's photo identification "'was tainted because she could not independently identify [the alleged perpetrator] as the person who committed the crime'" and "'was in fact relying on the accusation of her

boyfriend'" where the plaintiff failed to "allege that [the witness] had ever encountered or otherwise seen [the alleged perpetrator] prior to the photo array"); *see also Drummon v. Castro*, 522 F. Supp. 2d 667, 675 (S.D.N.Y. 2007) (finding probable cause to arrest where "the witness maintained in all his statements that he did not know the shooter" and there was no "evidence of a prior relationship between the witness and Plaintiff that would tend to suggest a hidden motive on the part of the witness or cast doubt on the witness's veracity"). To the extent Plaintiff argues Grady and Pridgen had a motive to lie to protect their neighbor Quantell Young—whom Plaintiff contends the Court should infer to be the perpetrator for purposes of summary judgment, *see* Dkt. No. 38 at 13-15—and that Defendants knew Grady and Pridgen had such a motive because all three witnesses are acquainted, the Court rejects that argument as pure conjecture.[2]

Finally, the fact that other witnesses gave inconsistent statements is not extraordinary and does not undermine the probable cause established by Pridgen's and Grady's independent identifications. *See Gisondi v. Town of Harrison*, 72 N.Y.2d 280, 285 (1988) ("In any investigation the police are likely to encounter discrepancies, particularly in cases involving eyewitness identification. These matters may impair their ability to prove guilt beyond a reasonable doubt at trial, but they generally have little bearing at preliminary stages where the only relevant concern is whether there is sufficient evidence to show probable cause to believe the defendant committed the crime"); *see also Radin v. City of New York*, 14–CV–7347, 2016 WL

---

[2] Moreover, the undisputed facts do not bear out Plaintiff's theory. For example, Plaintiff argues that Pridgen and Young could have colluded to change Pridgen's description of the suspect from 6'02" to a shorter height because Young is 6'02". *See id.* at 13-14. Although it is true Pridgen originally described the suspect as 6'02", police records show that Pridgen identified the suspect in the early morning hours of January 1, 2013 as approximately 5'07" to 6'00", *see* Dkt. No. 28-35 at ¶ 33, *before* he first returned home from the police station and allegedly colluded with Young. Similarly, Grady described the suspect as approximately 5'07" before she first returned home from the police station. *See id.* at ¶ 41.

3982463, *3 (E.D.N.Y. July 22, 2016) ("Similarly, in this case, that some victims did not identify plaintiff does not vitiate the probable cause that resulted from the identifications by Shuler and Terzulli"); *Parker v. Hogan*, 09–CV–910, 2011 WL 1988070, *3 (E.D.N.Y. May 20, 2011) ("The evidence of inconsistent descriptions of the events surrounding the murder of Blakney is neither unusual nor troubling").

Based on the foregoing, the Court finds that Defendants had probable cause to arrest Plaintiff. Therefore, Defendants' motion for summary judgment is granted as to counts one, three, and five of the complaint.

## C.    Malicious prosecution

"The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—*i.e.*, the right to be free of unreasonable or unwanted restraints on personal liberty." *Singer*, 63 F.3d at 116. The elements of malicious prosecution under section 1983 effectively mirror the elements of the same claim under New York law. *See Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992). Accordingly, to state a cause of action for malicious prosecution in New York, the plaintiff must prove (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in the plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for the defendant's actions. *See Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003). To sustain a malicious prosecution claim under section 1983, "the state law elements must be met, and there must also be a showing of a 'sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.'" *Rutigliano v. City of New York*, 326 Fed. Appx. 5, 8-9 (2d Cir. 2009) (quotation omitted).

"Probable cause is a complete defense to a malicious prosecution claim." *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 436 n.1 (S.D.N.Y. 2014), *aff'd*, 590 Fed. Appx. 112 (2d Cir. 2015). "Under New York law, a grand jury indictment 'creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by "fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith."'" *Cornell v. Kapral*, 483 Fed. Appx. 590, 592 (2d Cir. 2012) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003)). Moreover, "[i]t is well-established that an officer normally has probable cause to arrest 'if he received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.'" *Kanderskaya*, 11 F. Supp. 3d at 436 (quoting *Miloslavsky v. AES Eng'g Soc., Inc.*, 808 F. Supp. 351, 355 (S.D.N.Y. 1992), *aff'd*, 993 F.2d 1534 (2d Cir. 1993)). In the context of a malicious prosecution claim, "'even when probable cause is present at the time of arrest, evidence could later surface which would eliminate that probable cause.'" *Kent v. Thomas*, 464 Fed. Appx. 23, 25 (2d Cir. 2012) (alteration omitted) (quotation omitted). However, "'[i]n order for probable cause to dissipate, the groundless nature of the charge must be made apparent by the discovery of some intervening fact.'" *Kinzer v. Jackson*, 316 F.3d 139, 144 (2d Cir. 2003) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996)). "[T]he question is whether either the evidence gathered after arrest undermined a finding of probable cause, or whether the [ ] [d]efendants' inquiry into the alleged [crime] so far departed from what a reasonable person would have undertaken as to itself constitute evidence of lack of probable cause." *Rae v. County of Suffolk*, 693 F. Supp. 2d 217, 227 (E.D.N.Y. 2010). "[D]efendants are not obliged to exonerate [a] plaintiff or uncover exculpatory evidence, but the 'failure to make a further inquiry when a reasonable person would

have done so may be evidence of lack of probable cause.'" *Lawrence v. City Cadillac*, No. 10–CV–3324, 2010 WL 5174209, *6 (S.D.N.Y. Dec. 9, 2010) (quoting *Lowth*, 82 F.3d at 571).

In the present matter, the grand jury indictment creates a presumption of probable cause because Plaintiff was indicted on each of the charges related to his arrest. *See* Dkt. No. 28-35 at ¶ 100. Plaintiff argues that the presumption is rebutted for the following reasons: (1) Defendants withheld exculpatory evidence from the prosecutor, *see* Dkt. No. 38 at 20-27; (2) Defendants made fraudulent representations to the grand jury, *see id.*; and (3) evidence surfaced after Plaintiff's arrest sufficient to dissipate probable cause, *see id.* at 27-32. Drawing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has failed to rebut the presumption of probable cause.

Plaintiff asks the Court to infer that Defendant DeJoseph intentionally suppressed evidence by failing to provide Chief ADA Doran with the police report of Officer James O'Brien in which Officer O'Brien noted that a witness failed to identify Plaintiff from a photo array, *see id.* at 24, because the report was not part of a host of materials Chief ADA Doran provided to Plaintiff in response to Plaintiff's request for all records, memoranda, reports, evidence, recordings, and transcripts regarding Plaintiff's criminal matter, *see* Dkt. No. 28-21. As a preliminary matter, there is no evidence that *Defendant DeJoseph* suppressed any evidence. *Fappiano v. City of New York*, No. 01–CV–2476, 2015 WL 94190, *13 (E.D.N.Y. Jan. 7, 2015), *aff'd*, 640 Fed. Appx. 115 (2d Cir. 2016) ("Likewise, the purported suppression of Photo Showings 1 and 2 does not rebut the presumption of probable cause. As a preliminary matter, there is no evidence that *Gottlieb,* as opposed to Dunbar and Sciallo, who allegedly administered the photo showings, suppressed Photo Showings 1 or 2"). On the contrary, Defendant DeJoseph testified to his belief that Chief ADA Doran "gets all the reports" and "would have known" about

Officer O'Brien's report. *See* Dkt. No. 28-30 at 71. Thus, the "[t]he most [Plaintiff] has presented the [C]ourt is evidence of mistake of fact or possible negligence," which "cannot sustain a cause of action for malicious prosecution." *Zahrey v. City of New York*, No. 98–CV–4546, 2009 WL 54495, *17, *17 n.33 (S.D.N.Y. Jan. 7, 2009) (finding that the presumption of probable cause was not rebutted despite allegations that "the defendants intentionally withheld from [the prosecutor] the inconsistent statements of witnesses"); *Stukes v. City of New York*, No. 13–CV–6166, 2015 WL 1246542, *7 (E.D.N.Y. Mar. 17, 2015) ("[P]ossible negligence in failing to . . . forward exculpatory evidence is insufficient to rebut the presumption created by the indictment"); *see also Savino*, 331 F.3d at 74 (finding the presumption of probable cause unrebutted where the plaintiff failed to present evidence that exculpatory information was "intentionally withheld" from prosecutors). Moreover, the omission of Officer O'Brien's report "does not rise to the level of egregious deviations from statutory requirements or accepted practices required to overcome the grand jury presumption," *O'Brien*, 2013 WL 1234966, at *15, because the fact that some witnesses "did not identify [P]laintiff does not vitiate the probable cause that resulted from the identifications by [Pridgen and Grady]," *Radin*, 2016 WL 3982463, at *3.

Plaintiff also argues that the presumption of probable cause is rebutted because Defendants failed to testify at the grand jury to certain exculpatory evidence, including inconsistencies in Pridgen's statements, inconsistencies between the statements of Pridgen and Grady and those of other witnesses, and Plaintiff's alibi. *See* Dkt. No. 1 at ¶¶ 75-129. The Court rejects this argument because it was the prosecutor, not the Defendant officers, "who had the discretion and authority to decide what evidence to present to the grand jury," and he "was under no duty to present every item of arguably exculpatory evidence in seeking an indictment." *Savino*, 331 F.3d at 75; *see also Daly v. Ragona*, No. 11–CV–3836, 2013 WL 3428185, *7

(E.D.N.Y. July 9, 2013) ("Accordingly, even if the Court assumes that the evidence . . . was also withheld from the Grand Jury proceedings, the decision not to present such information to the Grand Jury does not amount to conduct undertaken in bad faith and, therefore, does not rebut the presumption of probable cause created by the indictment. In any event, the only defendants in this case are police officers who cannot be held liable for any independent decisions by the prosecutors"). More fundamentally, Plaintiff cannot use Defendants' grand jury testimony to overcome the presumption of probable cause. *See Brown v. City of New York*, No. 08–CV–5095, 2013 WL 1338785, *4 n.3 (E.D.N.Y. Apr. 1, 2013) (finding that a "plaintiff cannot . . . use [an officer's] grand jury testimony to rebut the presumption of probable cause") (citing *Rehberg v. Paulk*, 566 U.S. 356, 369 (2012)); *see also Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) ("Even if Peterson had been able to marshal evidence sufficient to show that Officer Regina lied in the grand jury, he would still fail to make out a claim for malicious prosecution because police officers are entitled to absolute immunity for their testimony before the grand jury") (citing *Rehberg*, 566 U.S. at 375).

Finally, the Court rejects Plaintiff's argument based on evidence that came to light after the initiation of the prosecution[3] because such evidence was not available when Plaintiff was arraigned on January 2, 2013. *See Kanderskaya*, 11 F. Supp. 3d at 436 n.1 (finding that malicious prosecution depends upon whether probable cause existed at the time of arraignment); *see also*

---

[3] Specifically, Plaintiff contends that (1) an SPD officer received exculpatory security video footage on January 4, 2013, *see* Dkt. No. 39 at ¶ 236; (2) a search of Plaintiff's phone on January 28, 2013 revealed no connections between Plaintiff and Mr. Jones, *see* Dkt. No. 23-10 at 3; (3) an SPD officer processed Mr. Jones's vehicle for fingerprints on January 9, 2013, which resulted in the issuance of a report on October 18, 2013 finding that no prints matched Plaintiff's, *see* Dkt. No. 39 at ¶¶ 242-47; (4) lab reports dated April 15, 2013 and October 15, 2013 revealed that no blood was found on any of Plaintiff's clothes, *see* Dkt. No. 44-2; and (5) a DNA report issued May 5, 2013 concluded that DNA collected from Mr. Jones's left-hand fingernail scrapings excluded Plaintiff as a possible contributor of the DNA profile, *see* Dkt. No. 39 at ¶¶ 256, 259.

*Varela v. City of Troy*, No. 10–CV–1390, 2014 WL 2176148, *5 (N.D.N.Y. May 22, 2014)

(finding that "for a malicious prosecution claim, probable cause is measured at the time of the

arraignment").  Rather, by the time such evidence came to light, it was Chief ADA Doran's

prerogative to pursue the charges.  *See Fappiano*, 640 Fed. Appx. at 120 ("The police officer

Defendants, furthermore, are not liable for the prosecutors' decision to pursue the charges after

the [serology] results failed to link Fappiano to the crime") (citing *Bernard*, 25 F.3d at 104).

Further, the fact that Defendants did not locate a murder weapon or the orange hooded "C"

sweatshirt described by eyewitnesses Pridgen and Grady between the time of Plaintiff's arrest and

arraignment is not sufficient to defeat probable cause because the failure to uncover such

evidence does not establish that the charges against Plaintiff were "'groundless.'"  *Kinzer*, 316

F.3d at 144 (quoting *Lowth*, 82 F.3d at 571).

  For the foregoing reasons, the Court finds that Plaintiff has failed to carry his burden of

rebutting the presumption of probable cause.  Therefore, Defendants' motion for summary

judgment is granted as to counts two, four, and six of the complaint.

## D.   *Monell* liability

  "Although municipalities are within the ambit of section 1983, municipal liability does not

attach for actions undertaken by city employees under a theory of *respondeat superior*."  *Birdsall*

*v. City of Hartford*, 249 F. Supp. 2d 163, 173 (D. Conn. 2003) (citing *Monell v. New York City*

*Dep't of Soc. Servs. of New York*, 436 U.S. 658, 691 (1978)).  Despite the fact that *respondeat*

*superior* liability does not lie, a municipal entity or employee sued in his or her official capacity

can be held accountable for a constitutional violation that has occurred pursuant to "a policy

statement, ordinance, regulation, or decision officially adopted and promulgated by [the

municipality's] officers . . . [or] pursuant to governmental 'custom' even though such a custom has

not received formal approval through the body's official decision-making channels." *Monell*, 436 U.S. at 690-91. Municipal liability can be established in a case such as this in several different ways, including through proof of an officially adopted rule or widespread, informal custom demonstrating "a deliberate government policy or failing to train or supervise its officers." *Bruker v. City of New York*, 337 F. Supp. 2d 539, 556 (S.D.N.Y. 2004) (quoting *Anthony v. City of New York*, 339 F.3d 129, 140 (2d Cir. 2003)). A plaintiff may also show that the allegedly unconstitutional action was "taken or caused by an official whose actions represent an official policy," or when municipal officers have acquiesced in or condoned a known policy, custom, or practice. *See Jeffres v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000), *cert. denied sub nom.*, *County of Schenectady v. Jeffes*, 531 U.S. 813 (2000); *see also Wenger v. Canastota Cent. Sch. Dist.*, No. 95–CV–1081, 2004 WL 726007, *3 (N.D.N.Y. Apr. 5, 2004).

As a preliminary matter, a claim against a municipal officer in his official capacity is essentially a claim against the municipality. *See Odom v. Matteo*, 772 F. Supp. 2d 377, 392 (D. Conn. 2011) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001)); *Wallikas v. Harder*, 67 F. Supp. 2d 82, 83-84 (N.D.N.Y. 1999). Therefore, when a section 1983 claim is brought against a municipal entity and an officer in his official capacity, "the official capacity claim should be dismissed as duplicative or redundant." *Odom*, 772 F. Supp. 2d at 392; *see also Wallikas*, 67 F. Supp. 2d at 84. In the present case, Plaintiff has alleged identical *Monell* claims against the City of Syracuse and Defendant Fowler in his official capacity. Therefore, the Court finds the claim against Defendant Fowler in his official capacity is duplicative. Moreover, since Plaintiff has failed to plausibly allege any unconstitutional conduct against the individual Defendants, Plaintiff's municipal liability claim must be dismissed. *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) ("Because the district court properly found no underlying

18

constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct").  Therefore, Defendants' motion for summary judgment is granted as to count seven of the complaint.

**E.     Leave to amend**

"Although Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend 'shall be freely given when justice so requires,' it is within the sound discretion of the district court to grand or deny leave to amend.  A district court has discretion to deny leave for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (quotation and citations omitted).

In the present matter, Plaintiff seeks to add (i) four additional officers as parties for purposes of all counts of the complaint other than Plaintiff's *Monell* claim and (ii) a new cause of action for failure to intervene with Plaintiff's arrest and prosecution against all current and proposed individual Defendants.  *See* Dkt. No. 45-11.  However, Plaintiff has failed to provide any explanation as to why he delayed requesting leave to amend until after Defendants had filed their motion for summary judgment—more than a year after the deadline to amend pleadings, months after the close of discovery, and nearly two years after filing the complaint.  *See McCarthy*, 482 F.3d at 202 ("Plaintiffs sought to amend their complaint after an inordinate delay. By that time, discovery had closed, defendants had filed for summary judgment, and nearly two years had passed since the filing of the original complaint").

Moreover, it would be futile to add the proposed individuals because the Court has found probable cause for Plaintiff's arrest and prosecution, and Plaintiff has failed to plead any facts either establishing that the proposed defendants lacked probable cause for Plaintiff's arrest or

rebutting the presumption of probable cause to prosecute Plaintiff. *See Morgan v. County of Nassau*, No. 13–CV–06524, 2017 WL 664027, \*19 (E.D.N.Y. Feb. 17, 2017) ("Based on the current record, the police had probable cause to arrest plaintiffs, and plaintiffs have not rebutted the presumption of probable cause for their malicious prosecution claim. Plaintiffs, therefore, do not have viable causes of action against <u>any</u> police officers who may have been involved in the arrest and prosecution. Accordingly, amending the complaint to add the names of more police officers would be futile"). It would also be futile to add a failure to intervene claim because the Court has found that Plaintiff's underlying constitutional claims fail. *See Briukhan v. City of New York*, 147 F. Supp. 3d 56, 62 (E.D.N.Y. 2015) ("His failure to intervene claim, premised on officer Fesinstine's failure to interrupt alleged constitutional violations, is derivative of the underlying claims of unlawful stop, false arrest, fabrication of evidence, and malicious prosecution. Because his underlying claims fail, so does failure to intervene").

For the foregoing reasons, Defendants' cross-motion for leave to amend is denied.

## IV. CONCLUSION

After carefully considering the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the Defendants' motion for summary judgment is **GRANTED;** and the Court further

**ORDERS** that Plaintiff's cross-motion for leave to amend is **DENIED;** and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

Dated: March 21, 2017
      Albany, New York

Mae A. D'Agostino
U.S. District Judge